# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 14, 2022               Decided March 8, 2022

No. 21-7040

MARK SHAFFER, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED, ET AL.,
APPELLANTS

v.

GEORGE WASHINGTON UNIVERSITY AND BOARD OF TRUSTEES
OF GEORGE WASHINGTON UNIVERSITY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-01145)

———

*Daniel J. Kurowski* argued the cause for appellants Mark Shaffer, et al. With him on the briefs were *Steve W. Berman, Glenn Ivey,* and *Andrew S. Levetown.*

*Alan Schoenfeld* argued the cause for appellees. With him on the brief were *Jamie Gorelick, Bruce M. Berman, Susan Pelletier,* and *Swapna Maruri.*

*Jessica L. Ellsworth* and *Nathaniel A. G. Zelinsky* were on the brief for *amici curiae* American Council on Education and 18 Other Higher Education Associations in support of appellees.

No. 21-7064

MAAZ QURESHI, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED, ET AL.,
APPELLANTS

v.

AMERICAN UNIVERSITY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-01141)
(No. 1:20-cv-01454)
(No. 1:20-cv-01555)

———

*Roy T. Willey* argued the cause for appellants Maaz Qureshi, et al. With him on the briefs was *Curtis A. Boykin.*

*Alan Schoenfeld* argued the cause for appellee. With him on the brief were *Bruce M. Berman* and *Susan Pelletier.*

*Jessica L. Ellsworth* and *Nathaniel A. G. Zelinsky* were on the brief for *amici curiae* American Council on Education and 18 Other Higher Education Associations in support of appellee.

Before: MILLETT and JACKSON,[*] *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

———

[*] Circuit Judge Jackson was a member of the panel at the time the case was argued but did not participate in this opinion.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The two cases that we consider in this appeal, like many others that have been litigated across the country, are by-products of the COVID-19 pandemic. As described by the *amici* higher education institutions:

> In March 2020, America faced a rapidly-evolving crisis. For colleges and universities, the challenges were acute. Dormitories, classrooms, research laboratories, libraries, and arenas risked spreading COVID-19, endangering students, faculty, staff[,] and surrounding communities. To safeguard public health and to comply with shelter-in-place orders, higher education institutions pivoted in the moment. They physically closed campuses in large part, while searching for and inventing solutions to allow them to continue to serve their students in unpredictable and unprecedented times. For colleges and universities— like so many other sectors of society—virtual platforms were part of the answer. [Online] [p]rograms like Citrix, Microsoft Teams, and Zoom meant students could complete the last portion of their spring semester courses without interruption.

Br. for *Amici Curiae* American Council on Education and 18 Other Higher Education Associations 8. These colleges and universities contend that their "rapid transition [to] online [educational services, in place of in-person educational activities] was no small feat. . . . [And] [a]s a result of these efforts, . . . the class of 2020 graduated on time at institutions around the country." *Id*. at 8-9.

Many students and their parents see the matter very differently. For example, the Appellants in one of the cases here on appeal contend that:

> [T]he COVID-19 global pandemic disrupted the daily lives of nearly all Americans. . . . [Students] who paid tens of thousands of dollars in tuition and fees to get an in-person educational experience, including all of the services, opportunities, and activities that come therewith, [had] that in-person experience ripped away. Students . . . could have enrolled in one of the country's many online learning institutions – at a far cheaper cost – but opted to pay a premium for an in-person educational experience. Many students undertook significant debt to make these tuition and fee payments. Nonetheless, [the universities have] refused to refund a penny of the tuition students . . . paid for an in-person educational experience.

*Qureshi* Appellants' Br. 1.

The Appellees in the cases before the court, American University ("American") and George Washington University ("GW") (together, "Universities" or "Defendants"), responded to the COVID-19 pandemic, just as did many other schools, by transitioning from in-person to online learning programs and largely shutting down campus activities. In two separate actions, students and parents (collectively, "Plaintiffs") filed complaints in the District Court claiming that the Universities violated contractual commitments to their students when they transitioned to online educational activities and declined to refund any portion of their students' tuition payments and fees. Plaintiffs also alleged, in the alternative, that the transitions to online learning unjustly enriched the Universities. Defendants moved to dismiss the actions for failure to state a claim, and

the District Courts granted their motions. *See Shaffer v. George Washington Univ.*, Civ. No. 20-1145, 2021 WL 1124607, at \*2-3 (D.D.C. Mar. 24, 2021), *reprinted in Shaffer* Joint Appendix ("J.A.") 1936-39; *Crawford v. Presidents & Dirs. of Georgetown Coll.*, 537 F. Supp. 3d 8, 17-30 (D.D.C. 2021) ("*Qureshi*"), *reprinted in Qureshi* Deferred Appendix ("App.") 55-78. Plaintiffs now appeal. Applying District of Columbia law to the novel and challenging issues that these cases present, we affirm in part and reverse in part the judgments of the District Courts and remand the cases for further proceedings.

First, we affirm the District Courts' dismissals of Plaintiffs' claims that the Universities breached *express* contracts promising in-person educational instruction, activities, and services in exchange for tuition and fees. The materials cited by Plaintiffs do not support these claims. However, we hold that Plaintiffs' complaints plausibly allege that the Universities breached *implied-in-fact* contracts for in-person education. Plaintiffs' factual allegations, combined with the reasonable inferences drawn from them, suffice to support their claims that the Universities promised to provide in-person instruction in exchange for Plaintiffs' tuition payments.

Plaintiffs also plausibly allege that the Universities impliedly promised to provide on-campus activities and services in exchange for some of the student fees at issue. The *Shaffer* Plaintiffs state a claim for breach of contract as to the additional course fees, but not as to the student association fee. The *Qureshi* Plaintiffs state a claim for breach of contract as to the sports center fee, but not as to the activity fee, technology fee, or Metro U-Pass fee.

We therefore reverse the District Courts' dismissals of Plaintiffs' implied-in-fact contract claims with respect to tuition and some – but not all – of the fees at issue. We note

that the Universities will likely have compelling arguments to offer that the pandemic and resulting government shutdown orders discharged their duties to perform these alleged promises. However, because the Universities have not raised any such defense before this court, we leave the issue to the District Courts to resolve in the first instance.

Furthermore, we reverse the District Courts' dismissals of Plaintiffs' unjust enrichment claims. Plaintiffs were free to raise unjust enrichment claims in the alternative to their breach-of-contract claims. The complaints contain sufficient plausible factual allegations to reasonably infer that Plaintiffs provided the benefit of tuition and certain fees under a contract that does not cover the issue in dispute, or is invalid, subject to avoidance, or otherwise ineffective. This inference does not affect the plausibility of the breach-of-contract claims because Plaintiffs are allowed to advance inconsistent and alternative theories of recovery. The District Courts must first determine the contours of any promises governing in-person educational instruction and activities, the Universities' duties to perform any such promises, and the Universities' rights (if any) to retain already-paid tuition and fees even if on-campus instruction were cancelled. After these matters have been resolved, Plaintiffs may then be in a position to pursue their claims for unjust enrichment.

Next, we affirm the District Court's dismissal of the *Qureshi* Plaintiffs' conversion claim. This claim fails because Plaintiffs do not plausibly allege a possessory interest in a specific, identifiable fund of money.

Finally, we reverse and remand the District Court's dismissal of the *Qureshi* Plaintiffs' D.C. Consumer Protection Procedures Act claim, as the trial court's analysis turned on its mistaken conclusion that Plaintiffs failed to plausibly allege

that the University promised in-person instruction and activities in exchange for tuition and certain fees.

## I. BACKGROUND

These cases are before the court on review of motions to dismiss. Therefore, we recite the facts as Plaintiffs allege them, with reasonable inferences drawn in their favor. *See VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1102 (D.C. Cir. 2021).

George Washington University and American University are institutions of higher learning located in Washington, D.C. GW offers approximately fifty on-campus doctorate programs and ten online doctorate programs. It offers seventy-five on-campus undergraduate programs and nine online undergraduate programs. GW charges significantly higher rates for its on-campus programs than for the online counterparts.

American also offers a variety of on-campus degree programs. It does not offer undergraduate online degrees, although it does offer some undergraduate online courses. American's Online Learning programs are "listed independently on a separate web page, where separate policies and cost information depend[] on the individual online program." *Qureshi* Compl. ¶ 116, App. 21.

Plaintiffs paid all tuition and fees required for enrollment in on-campus instruction and experiences for the spring 2020 semester. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic; travel and assembly restrictions in the United States quickly followed. In response to the pandemic, the Universities shifted all on-campus classes to online learning in mid-March 2020 and held classes virtually

for the rest of the semester. The Universities also suspended events and activities. Neither University offered prorated refunds of spring 2020 tuition or of the fees at issue in these actions.

The *Shaffer* Plaintiffs – GW students and parents – filed a consolidated class action complaint in the District Court in July 2020. Their complaint alleges they "paid GW for high-quality, in-person instruction that is no longer available to them, access to buildings they can no longer enter, technology, programs[,] and services that GW is no longer providing, and activities that are no longer available," resulting in "an enormous windfall to GW." *Shaffer* Compl. ¶ 7, J.A. 17. The complaint includes claims for breach of express or implied contract, unjust enrichment, and conversion. Plaintiffs seek "disgorgement and monetary damages in the amount of prorated, unused amounts of tuition and fees that Plaintiffs and the other Class members paid." *Id.* ¶ 8, J.A. 17.

In the District Court, GW moved to dismiss. The trial court granted the motion, reasoning that "no plausible reading of the university materials gives rise to an enforceable contractual promise for in-person instruction." *Shaffer*, 2021 WL 1124607, at *2. The court also concluded that Plaintiffs' unjust enrichment claim was inappropriate because it required the court to displace the terms of the alleged contract and that the conversion claim was insufficiently distinct from the contract claims. *Id.* at *3.

The *Qureshi* Plaintiffs – American University students – filed a putative class action in the District Court raising similar claims. In addition to their claims for breach of contract, unjust enrichment, and conversion, the *Qureshi* Plaintiffs allege the University violated the District of Columbia's Consumer Protection Procedures Act. They ask the court to require the

University to "disgorge amounts wrongfully obtained for tuition and fees," *inter alia*. *Qureshi* Compl., App. 35.

The District Court granted American's motion to dismiss, concluding that the University "impliedly promised, at most, to make a good-faith effort to provide on-campus education, while retaining the right to deviate from the traditional model if they reasonably deemed it necessary to do so." *Qureshi*, 537 F. Supp. 3d at 22. The trial court also determined that Plaintiffs failed to plausibly allege that the University violated promises to provide services in exchange for the fees at issue. *Id.* at 27-29. It held that Plaintiffs' contract claims precluded their unjust enrichment claims and that, alternatively, the students failed to plausibly allege it was unjust under the circumstances for American to retain their entire tuition and fee payments. *Id.* at 23-25, 29. The court dismissed the conversion claim because Plaintiffs "fail[ed] to allege that they have the right to a specific identifiable fund of money." *Id.* at 25-26, 29 (internal quotation marks and citation omitted). Finally, it dismissed the Consumer Protection Procedures Act claim, reasoning that Plaintiffs failed to plausibly allege the University made any false or misleading representations or omissions regarding its tuition or fees. *Id.* at 26, 29.

Before this court, the *Shaffer* Plaintiffs renew only their breach-of-contract and unjust enrichment claims. The *Qureshi* Plaintiffs renew their breach-of-contract, unjust enrichment, conversion, and Consumer Protection Procedures Act claims. The American Council on Education and eighteen other higher education associations (collectively, "*Amici*") filed *amicus* briefs supporting the Universities in both actions.

## II. ANALYSIS

### A. Standard of Review

This court reviews *de novo* a District Court's grant of a motion to dismiss for failure to state a claim. *See Khodorkovskaya v. Gay*, 5 F.4th 80, 84 (D.C. Cir. 2021).

### B. Breach of Contract

Plaintiffs first argue that the District Courts erred in dismissing their breach-of-contract claims. We reject Plaintiffs' claims that the Universities breached *express* contracts promising in-person educational activities. However, as we explain below, Plaintiffs plausibly allege that the Universities breached *implied* promises to provide in-person education in exchange for tuition. Plaintiffs also plausibly allege that the Universities breached *implied* promises to provide on-campus services and activities in exchange for some – but not all – of the student fees at issue.

"[T]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Mawakana v. Bd. of Trs. of Univ. of D.C.*, 926 F.3d 859, 869 (D.C. Cir. 2019) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). "Contracts are often spoken of as express or implied." Restatement (Second) of Contracts § 4 cmt. a (Am. L. Inst. 1981). "Under D.C. law, an implied-in-fact contract contains 'all necessary elements of a binding agreement,' differing from other contracts 'only in that it has not been committed to writing' and is instead 'inferred from the conduct of the parties.'" *Camara v. Mastro's Rests. LLC*, 952 F.3d 372,

375 (D.C. Cir. 2020) (quoting *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 81 (D.C. 2017)).

"[T]he relationship between a university and its students is contractual in nature." *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977) (per curiam). "[T]he terms set down in a university's bulletin become a part of that contract," but "the mere fact that the bulletin contain[s] language" on a topic "is not enough to support a finding that the language amounted to a contractual obligation." *Id.* at 1366-67 (citations omitted). "Whether a given section of the bulletin also becomes part of the contractual obligations between the students and the university . . . depend[s] upon general principles of contract construction." *Id.* at 1367. Other university publications can also constitute a part of the contract between a university and its students. *See, e.g.*, *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) (accepting parties' assumption that the Code of Conduct printed in the student manual constituted a part of the contract between the university and its students).

In cases "raising the construction of a student-university contract," "'the document itself must be viewed as a whole' and 'the court should view the language of the document as would a reasonable person in the position of the parties.'" *Id.* (quoting *Basch*, 370 A.2d at 1367). Under District of Columbia law, "[c]ontracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is." *Greene v. Howard Univ.*, 412 F.2d 1128, 1135 (D.C. Cir. 1969). Although "the *usual practices* surrounding a contractual relationship can themselves be raised to the level of a contractual obligation," *Pride*, 384 A.2d at 35 (citation omitted), words that merely "express[] an expectancy" regarding future conduct do not

suffice to create a contractual obligation "susceptible of enforcement," *Basch*, 370 A.2d at 1368.

Here, Plaintiffs contend that a material term of their contracts with the Universities, whether express or implied, was that the Universities would provide on-campus education and experiences in exchange for their tuition and fees. We easily conclude that Plaintiffs fail to plausibly allege the parties had *express* contracts with such a term, as they point to no language indicating that the provision of in-person education and on-campus services was an explicit term of the parties' agreements. Whether Plaintiffs plausibly allege that the parties had *implied* contracts is a more difficult question. However, as we explain, on the record before us, Plaintiffs' complaints are largely sufficient to avoid motions to dismiss for failure to state causes of action on their implied contract claims.

We will analyze Plaintiffs' tuition claims separately from their fee claims.

### 1. Tuition

Accepting the complaints' factual allegations as true and drawing all reasonable inferences from those allegations in Plaintiffs' favor, we conclude that Plaintiffs adequately allege the Universities breached an implied-in-fact contract to provide in-person education in exchange for tuition. At this early stage of the litigation, Plaintiffs need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs' tuition claims clear this hurdle.

Notably, both Universities' communications contain numerous references to the benefits of their on-campus

instruction. For example, GW's Bulletin highlights "on-campus presentations by leading practitioners," "on-campus group supervision" for practicums and clinicals, "hands-on training" in workshops, and "hands-on laboratory experience using laboratory facilities." *Shaffer* Compl. ¶ 47, J.A. 27-28 (alterations, omission, and citations omitted). American's website states that the University has "a focus on experiential learning" and describes the campus as giving students "the advantages of a traditional college setting," which presumably encompasses in-person learning. *Qureshi* Compl. ¶¶ 83, 87, App. 16-17.

The Universities' alleged pricing of online education provides additional support for the inference that the Universities promised in-person education in exchange for Plaintiffs' tuition payments. For example, "during the 2019-2020 academic year, for graduate students in GW's School of Engineering & Applied Science, [GW] assessed $1,965 per credit in tuition for on-campus students, and only $975 per credit for students in the 'M.S. *(online)*' program." *Shaffer* Compl. ¶ 43, J.A. 26. For the spring 2020 semester, "students enrolled in GW's Health Sciences [undergraduate] programs— which are only offered online—were charged $615 per credit in tuition, or $11,070 for an 18-credit semester," while "their colleagues in GW's on-campus undergraduate programs paid between $25,875 and $29,275 in tuition." *Id.*; *see also Qureshi* Compl. ¶ 116, App. 21 (alleging that American's Online Learning programs are "listed independently on a separate web page, where separate policies and cost information depend[] on the individual online program").

We also draw the reasonable inference from Plaintiffs' factual allegations that the Universities have a historic practice of providing on-campus instruction to students who pay the

tuition associated with traditional on-campus – rather than online – education.

Drawing all reasonable inferences from these factual allegations in Plaintiffs' favor and "[v]iewing the pertinent language as a whole," we "conclude that a reasonable person would have assumed that the Universit[ies] intended to bind" themselves to providing in-person education in exchange for retaining Plaintiffs' entire tuition payments for traditional on-campus degree programs. *See Basch*, 370 A.2d at 1367; *Ninivaggi v. Univ. of Del.*, Nos. 20-cv-1478, 20-cv-1693, 2021 WL 3709765, at *5 (D. Del. Aug. 20, 2021) (Bibas, J., sitting by designation) ("This history, custom, and course of dealing, along with the school's statements, plausibly created an implied promise of in-person classes."). Plaintiffs also plausibly allege the Universities breached this duty, and that Plaintiffs suffered harm as a result. Accordingly, they state claims for breach of contract.

In opposition to the Plaintiffs' complaints, the Universities argue the "reservation of rights" provisions in their publications undermine the plausibility of Plaintiffs' contract claims. The applicable provision in American's catalog states that the University "reserves the right to amend the policies and information contained in the University Catalog from time to time, with or without notice." *Qureshi*, 537 F. Supp. 3d at 16. The reservation of rights in GW's Bulletin states: "The University reserves the right to change courses, programs, fees, and the academic calendar, or to make other changes deemed necessary or desirable, giving advance notice of change when possible." *Shaffer* J.A. 54. GW makes similar statements elsewhere in its materials. *See Shaffer* J.A. 90, 1918. But the reservation language does not specifically address emergencies or other *force majeure* events. In particular, it says nothing about allocating the financial risk of those events to the

students, as the Universities contend. Taking as true the Plaintiffs' allegations as to the course of conduct between them and the Universities, we cannot agree with Defendants that this language must as a matter of law be viewed by a reasonable person as allocating the entire financial consequences of the pandemic change to online classes to the students.

Indeed, the Universities cite nothing in their historical courses of dealings with their students to suggest that they have retained unfettered rights to shut down on-campus educational activities and use online learning in its place after students have paid tuition for traditional on-campus courses. As discussed, Plaintiffs plausibly allege that in-person education, along with on-campus educational activities, are the norm at both schools.

Defendants also argue that even if Plaintiffs' *have* plausibly alleged that the Universities made enforceable promises to provide in-person education, the contract claims nonetheless fail because Plaintiffs fail to allege cognizable damages. Here, the Universities stress that District of Columbia law prohibits courts from reviewing claims that test the quality or value of the education students receive. *See Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) ("[C]oncepts of academic freedom and academic judgment are so important that courts generally give deference to the discretion exercised by university officials."). The Universities' claims on this point ring hollow. At bottom, Plaintiffs challenge Defendants' failure to deliver the in-person instruction they allegedly promised to provide and for which the students had already paid. Determining whether the Universities in fact breached such promises does not require this court to subjectively value the quality of Plaintiffs' education. And Defendants' argument to the contrary overlooks the fact that the Universities *themselves* apparently charge different rates for online and in-person instruction.

For the foregoing reasons, we hold that Plaintiffs plausibly allege that the Universities breached implied-in-fact contracts to provide in-person instruction in exchange for tuition for on-campus degree programs. It is for the District Courts to resolve in the first instance whether the parties contracted for in-person education as alleged. If the District Courts conclude that the Universities made such promises – and that the legality of providing in-person instruction was a basic assumption on which the contracts were made – the Universities may still have strong arguments that the pandemic and resulting government-issued shutdown orders discharged their duties to perform. *See* Restatement (Second) of Contracts § 261 ("Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."); *id.* § 264 ("If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."); *Island Dev. Corp. v. District of Columbia*, 933 A.2d 340, 350 (D.C. 2007) (discussing the elements of impossibility). The Universities did not raise this defense before this court, and we do not reach it today.

Accordingly, we reverse the District Courts' dismissals of Plaintiffs' implied-in-fact contract claims as they relate to tuition.

### 2. Fees

Plaintiffs also plausibly allege that the Universities breached promises to provide in-person activities and services in exchange for some – but not all – of the fees at issue. The

*Shaffer* Plaintiffs state a claim for breach of contract as to the additional course fees, but not as to the student association fee. The *Qureshi* Plaintiffs state a claim for breach of contract as to the sports center fee, but not as to the activity fee, technology fee, or Metro U-Pass fee.

### i. George Washington University's Fees

The *Shaffer* Plaintiffs aver that "[a] material term of the bargain and contractual relationship" between the parties "was that [GW] would provide . . . access [to] on-campus facilities and services." *Shaffer* Compl. ¶ 109, J.A. 43. They allege GW refused to reimburse them for "the fees they paid for services they are not being provided, events they cannot attend, and programs and activities that have been curtailed, discontinued, or closed." *Id.* ¶ 5, J.A. 16. However, their pleading contains few specific factual allegations about these purported fees. *See, e.g., id.* ¶ 50, J.A. 28. In their briefing, Plaintiffs point to a page of the GW Bulletin – attached as an exhibit to their complaint – that refers to "Additional Course Fees" and a student association fee. *Id.* Ex. A, J.A. 103. Because the *Shaffer* Plaintiffs highlight no other specific fees, we confine our analysis to the additional course fees and student association fee.

As to the additional course fees, the GW Bulletin states that "[s]ome courses carry additional fees, such as a laboratory or material fee, charged by semester as indicated in course descriptions." *Id.* We draw the reasonable inference from this description that at least some of these course fees were associated with access to on-campus facilities or services. The scope of this fee is a factual issue for the District Court to resolve. Therefore, the *Shaffer* Plaintiffs state a claim for breach of contract with respect to the additional course fees.

The Bulletin provides the following description of the student association fee: "The student association fee is fixed, in keeping with the fixed-rate tuition plan. Undergraduate students entering in the fall 2019 semester and all graduate students are assessed a nonrefundable student association fee of $3.00 per credit to a maximum of $45.00 per semester." *Id.* These express terms do not tie the Student Association Fee to the provision of on-campus services, activities, and programs, and Plaintiffs' pleading is devoid of any specific factual allegations to the contrary. Accordingly, the District Court did not err by dismissing the breach-of-contract claim with respect to the student association fee.

### ii. American University's Fees

The *Qureshi* Plaintiffs allege American promised to "provide or make available the services, access, benefits[,] and/or programs" associated with the fees Plaintiffs paid for the spring 2020 semester. *Qureshi* Compl. ¶ 164, App. 28. Specifically, Plaintiffs point to four mandatory fees: a sports center fee, an activity fee, a technology fee, and a Metro U-Pass fee.

The sports center fee "is charged to all registered students, and is used to help pay for building maintenance and service costs associated with the sports center complex." *Id.* ¶ 161, App. 27. "Any registered student can use the entire sports complex facilities, including the fitness center." *Id.* Although the University states that the fee is "not a membership fee" for the fitness center, *id.*, we draw the reasonable inference from Plaintiffs' allegations that students paid the sports center fee in exchange for access to the sports complex facilities. Because they plausibly allege the University denied them access to these facilities, they state a claim for breach of contract with respect to the sports center fee.

The activity fee finances "student-sponsored programs that contribute significantly to the intellectual and social development of the student body, serve the university academic goals, encourage student participation and leadership, and enhance the general campus environment." *Id.* ¶ 160, App. 27. Because we see no indication that this fee encompasses only in-person organizations and does not support student groups operating online, Plaintiffs fail to plausibly allege American breached a duty to support student-run activities and programs.

The technology fee "helps to fund technology priorities, ranging from classroom instruction, faculty research, expanded computer labs, student portals, wireless connectivity, on-line registrations, faster internet connectivity, server upgrades, computer security, and administrative systems." *Id.* ¶ 162, App. 27. The University's technology services are available "[w]hether a student lives on-campus, off-campus, or abroad." *Id.* This indicates the University charges the same fee regardless of a student's physical location. As such, Plaintiffs fail to plausibly allege that the University breached the terms of this fee during its transition to online education.

The Metro U-Pass fee is "charged to full time students enrolled in an on-campus program" and "is valid for unlimited Metrorail and Metrobus transportation for the duration of the semester." *Id.* ¶ 163, App. 27. These services are provided by the Washington Metropolitan Area Transit Authority. *See Qureshi*, 537 F. Supp. 3d at 29 n.12. Here, although "students were 'strongly encouraged' to 'depart campus as soon as possible'" and "to return to their permanent homes," *Qureshi* Compl. ¶¶ 48-49, App. 8 (citation omitted), Plaintiffs do not allege that the University prohibited students from remaining in the Washington, D.C., metro area or revoked their access to public transportation. Accordingly, Plaintiffs fail to state a claim for breach of contract as to the Metro U-Pass fee.

For the foregoing reasons, we reverse the District Courts' dismissals of the implied-in-fact contract claims as to the additional course fees in *Shaffer* and the sports center fee in *Qureshi*. We affirm the District Courts' dismissals of the remaining fee claims.

## C. Unjust Enrichment

Next, Plaintiffs argue that the District Courts erred by dismissing their unjust enrichment claims. We agree. Plaintiffs' unjust enrichment claims have been raised as alternative claims to their breach-of-contract claims. Plaintiffs plausibly allege they provided the benefit of tuition and certain fees under a contract that does not cover the issue in dispute, or is invalid, subject to avoidance, or otherwise ineffective. As noted above, the District Courts must first determine the contours of any promises governing in-person education, the retention of tuition and fees in the absence of in-person education, and the Universities' duty to perform any such promises.

"Under D.C. law, '[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.' 'In such a case, the recipient of the benefit has a duty to make restitution to the other person.'" *In re APA Assessment Fee Litig.*, 766 F.3d 39, 45-46 (D.C. Cir. 2014) (alteration in original) (first quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005); and then quoting *4934, Inc. v. D.C. Dep't of Emp't Servs.*, 605 A.2d 50, 55 (D.C. 1992)) (citing *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 813-14 (D.C. 2009)).

"Unjust enrichment will not lie when 'the parties have a contract governing an aspect of [their] relation,' because 'a

court will not displace the terms of that contract and impose some other duties not chosen by the parties.'" *Id.* at 46 (alteration in original) (quoting *Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996)). But "[this] rule does not apply . . . if the contract is invalid or does not cover the issue in dispute." *Id.* (citing *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 135 (D.D.C. 2009)). Indeed, "[r]estitution claims of great practical significance arise in a contractual context . . . when a valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations." Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. c. (Am. L. Inst. 2011).

Accordingly, "[i]nsofar as the terms of the contracts govern[]" the provision and displacement of in-person education and services, as well as the Universities' retention of tuition and fees, the contracts between Plaintiffs and the Universities may "preclude[] an unjust enrichment claim." *In re APA Assessment Fee Litig.*, 766 F.3d at 47 (citing Restatement (Third) of Restitution and Unjust Enrichment § 2(2)); *see also Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) (per curiam) (explaining that "[t]he viability, and ultimately the success, of [a plaintiff's] unjust enrichment claim" depends on whether the contractual provision at issue "is legitimate and enforceable"); Restatement (Third) of Restitution and Unjust Enrichment § 2(2) ("A valid contract defines the obligations of the parties as to matters *within its scope*, displacing to that extent any inquiry into unjust enrichment." (emphasis added)).

Here, Plaintiffs bring their unjust enrichment claims as an alternative ground of liability in the event the District Courts conclude that no viable contract governs the provision of in-person education and services. *See Shaffer* Compl. ¶ 124, J.A.

46 ("To the extent Defendants contend that the Bulletin permits them to unilaterally and without notice change the terms under which Plaintiffs and Class members were to receive instruction, from on-campus to online, the promises made by Defendants to Plaintiffs and Class members to provide on-campus instruction were illusory and no contract exists between the parties."); *Qureshi* Compl. ¶ 173, App. 29 (pleading the unjust enrichment claim "to the extent it is determined a contract does not exist or otherwise apply").

In these cases, where the nature and enforceability of any promises the Universities made remain unresolved, Plaintiffs' alternative claims for unjust enrichment may proceed past the pleadings stage. The Federal Rules of Civil Procedure expressly allow parties to advance inconsistent and alternative theories of recovery at the pleadings stage. *See* Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief."); *id.* 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Therefore, the District Courts must address these claims.

On remand, the District Courts may well conclude that the contracts between Plaintiffs and the Universities "do[] not cover the issue in dispute," *In re APA Assessment Fee Litig.*, 766 F.3d at 46 (citation omitted), or are "invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations," Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. c. For example, as previously discussed, the trial courts may find that the Universities promised to provide in-person education and services, but the need to comply with government shutdown orders discharged their duty to perform. *See* Section II.B.1, *supra*. In such a case, claims for unjust enrichment may lie. *See* Restatement (Third)

of Restitution and Unjust Enrichment § 34(1) ("A person who renders performance under a contract that is subject to avoidance by reason of mistake or supervening change of circumstances has a claim in restitution to recover the performance or its value, as necessary to prevent unjust enrichment."); Restatement (Second) of Contracts § 272 cmt. b (discussing the availability of restitution where a party whose duty was "discharged because of impracticability of performance" already "received some of the other party's performance"); *Ninivaggi*, 2021 WL 3709765, at *6 ("[I]f the students prove that [a university] promised in-person classes, but the school shows that the promise was impossible to keep, the students might be able to recover restitution."). We leave it to the District Courts to address these considerations in future proceedings after the issues are fully briefed.

Because Plaintiffs plausibly allege they conferred a benefit – *i.e.*, their tuition and certain fee payments – to the Universities and that the Universities unjustly retained those benefits, Plaintiffs state claims for unjust enrichment.

The Universities argue that Plaintiffs fail to plausibly allege that it was inequitable for the Universities to retain students' entire tuition and fee payments. The Universities emphasize that Plaintiffs do not allege that the Universities used these payments "for any purpose other than advancing the educational goals of the Universit[ies]," and that students continued to receive instruction and credits toward their degrees. *Shaffer* Br. for Defs.-Appellees 45; *Qureshi* Br. for Def.-Appellee 45-46.

*Amici* also highlight the financial toll the pandemic has taken on colleges and universities across the country. They assert that, as a result of the transition to online learning, "higher education institutions incurred tremendous and

unexpected costs" while "revenue streams that are critical support for institutional operations—such as income from conferences, hospitals, dining halls, parking, athletic events, concessions, and summer programs—dried up." Br. for *Amici Curiae* American Council on Education and 18 Other Higher Education Associations 9.

We are sympathetic to these realities and have no doubt that unexpected costs and declining revenues placed significant financial strain on many colleges and universities. No one is claiming that the Universities acted with a purpose to cheat their students. And there is much in the record to suggest that the Universities did the best they could to protect and advance their students' educational interests. But determining whether the transition to online learning resulted in a net enrichment to GW and American is a fact-intensive question inappropriate for resolution at the motion-to-dismiss stage. *See Ninivaggi*, 2021 WL 3709765, at \*6 ("If the school saved money by substituting online for in-person classes, it might have to give those savings back to the students.").

For the foregoing reasons, we reverse the District Courts' dismissals of Plaintiffs' unjust enrichment claims.

### D. Conversion and D.C. Consumer Protection Procedures Act Claims

Finally, the *Qureshi* Plaintiffs ask this court to reverse the District Court's dismissal of their conversion and D.C. Consumer Protection Procedures Act ("CPPA") claims.

The conversion claim fails because Plaintiffs do not plausibly allege a possessory interest in "a specific identifiable fund of money." *Papageorge v. Zucker*, 169 A.3d 861, 864

(D.C. 2017) (citation omitted). Accordingly, we affirm the District Court's dismissal of the conversion claim.

The District Court's analysis and rejection of Plaintiffs' CPPA claim rested on its conclusion that Plaintiffs failed to allege that the University was bound by any implied-in-fact agreements relating to any commitments made to provide campus-based programs and facilities throughout the semester. *See Qureshi*, 537 F. Supp. 3d at 26, 29. For the reasons discussed in our analysis of Plaintiffs' breach-of-contract claims, we reject that conclusion. *See* Section II.B, *supra*. We therefore reverse the District Court's dismissal of the CPPA claim and remand for the trial court to reconsider American's motion to dismiss the CPPA claim in light of our analysis of Plaintiffs' breach-of-contract claims.

In addition, the District Court on remand may be required to consider American's alternative argument that the University is not subject to the CPPA, a theory the District Court declined to reach. *See Qureshi*, 537 F. Supp. 3d at 26 n.11. Although the D.C. Court of Appeals has held that "clearly a nonprofit educational institution is not a 'merchant' within the context of the [CPPA]," *Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch., Inc.*, 514 A.2d 1152, 1159 (D.C. 1986) (citation omitted), the D.C. Council subsequently revised the statute "to expose nonprofits otherwise acting as 'merchants' to the same level of liability as for-profit corporations," *In re APA Assessment Fee Litig.*, 766 F.3d at 53 (citing Nonprofit Organizations Oversight Improvement Amendment Act of 2007, 2007 D.C. Legis. Serv. (West)). The statute now bars a CPPA claim against a nonprofit if the claim is "based on membership services" or "training or credentialing activities," *inter alia*. D.C. Code § 28-3905(k)(5) (2022). The University attempts to invoke those exceptions and also argues that the instruction it provides is not a consumer good or

service within the meaning of the statute. *See id.* § 28-3901(a)(2)(B)(i), (a)(7). As necessary, the District Court should reach these arguments in the first instance on remand. We express no opinion as to whether the CPPA claim ultimately should survive the University's motion to dismiss.

Accordingly, we reverse the District Court's dismissal of the *Qureshi* Plaintiffs' CPPA claim and remand for further proceedings.

## III. CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the District Courts' judgments and remand for further proceedings consistent with this opinion.